Mr. Jones. It occurs to me that the starting point with this analysis is really to answer the question, can the government use after-acquired information to bolster deficiencies in proof at the time of the seizure when they seize some asset for forfeiture? That is what happened here, the magistrate judge, who was the district judge in this case. Well, counsel, all of the collateral information that the government had was not as a result of the stop or the arrest. It was as a result of surveillance and another investigation going on in the state of Florida. Is that correct? Some of the information, correct. Are you conceding that that information can be considered? No, I'm not. And for two reasons. And tell me why not. Well, there's two reasons. First off, I guess the threshold question is, can they even use after-acquired information to remedy a defect at the beginning of the case at the time of the seizure? And then even if you answer that question yes, is this particular information in this particular case tainted by the illegal search that occurred at the initiation of the case, not the initiation of the civil case, but the initiation of the seizure? In my view, it would be, it would erode the entire Fourth Amendment if the government could take property illegally and then go back. That's assuming the result now. That's the conclusion of law. It's an illegal seizure. Correct. Let's talk about the facts. Well, it was an illegal seizure. I mean, that's not an issue here. The government illegally seized this money. Mr. Jones, I think you misunderstood the judge's question. Okay. He understands that you can reach that conclusion, but he says it's a, there was a seizure. Correct. Whether it's legal or illegal is the conclusion. Correct. And that's what he was saying. That's all he was saying. Right. Well, it was the opinion of the district judge here that it was an illegal seizure. At the initiation, at the time of the road, that was an illegal seizure. Of course, the officer involved didn't know it at the time. That was a court determination later on. But those events, that event sent out a variety of other responses, including the initiation of this lawsuit, some discovery requests as a result of the initiation of the lawsuit, and contact by the DEA and Flagstaff with their State counterpart in Florida to start obtaining some information that they did not have. I think you better be very careful what the record reflects. When you paint the brush, paint with a broad brush and say all these facts were discovered after the petition was filed, quite to the contrary. Within a day of the stop, information was flowing from government agents in Florida to the prosecutor who filed the complaint. Oh, no. I'm not disputing that. Maybe I misunderstood. That's why he was trying to take you step by step. Okay. He said that if it was an illegal seizure, that's the conclusion. Now let's go through steps. And he was going to take you, and you might want to let him do it. Okay. I will. Well, you say the record, I can read the record and have. But you say the record reflects that this is after the filing of the petition for forfeiture, that additional necessary facts were discovered. If I said that, I misspoke, because there was some information that occurred that was discovered by the government after the filing. But I think the important connection between the events in Arizona and the investigation in Florida was learned by the government, by the DEA agents, that same day. They knew through NADIS or whatever it was. It's all the same government. It's the United States government. So there were agents in Florida working money laundering cases, working narcotics cases that were familiar with the parties that were found in the truck when the truck was stopped. Correct. You concede that? It's all one government. I don't contest that. Okay. So the information that the government had in Florida is in no way tainted by this stop. Well, my position would be opposite. Certainly there was a Florida investigation, and what was known at that point was that the driver of the truck in Arizona was seen in some surveillance entering the home of one of the drug suspects in Florida, something along those lines. My position is that but for the illegal seizure in Arizona, the gentleman in the car would have been told just go on down the road, have a nice date, no one's drunk here, no one's tired here, there's no traffic infractions, see you later. But because of the illegal seizure that occurred after that stop, that led in the arrest of these people and a DEA involvement and DEA investigation led them to Florida and then things flowed from there. So you're talking about after acquired information, you were talking about post-seizure, not post-petition. Right. Maybe I started off wrong. After acquired, post-seizure information. Correct. And in my view, statutorily, I don't think it was the intent of Congress when they allowed after acquired information to be used to cure defects in a complaint at the time of the filing to go all the way back to defects in the level of suspicion necessary at the time of a seizure itself. Because the forfeiture statutes, if you read 1916, 15, 881 and 981, it seems clear to me that probable cause is necessary at the time of the seizure. Indeed, the authority to start a forfeiture action requires probable cause by the government at the time of the seizure. So then the question is, can you use the... Let me see if I can make this very simple for you. I'm an agent and I see this motor vehicle and it has Florida plates. I take the Florida plate number and I run it back to Florida and to the DEA office or something like that. Have you guys got anything going? Yes, we've got a money laundering case going and we've got an observation of some drug trafficking negotiations between Camacho and the person you have in custody. And so there's a tie in there, right? Correct. So you know you're dealing with drug dealers. Do you concede that? I'm sorry. I didn't hear that last part. You know you're dealing with drug dealers. The government does. Yeah, at that point they are suspicious of these guys. Correct. And none of that evidence is tainted. But that's not the facts of this case. They did not do that. They did not conduct any investigation at all into Miguel Camacho until after he was illegally arrested, after the illegal seizure of the money contained in the car. It's not that they identified him and said let me run a records check on you right there on the side of the road and said, oh, now I'm suspicious because there's some connection between you and some suspects in Florida. That's not what occurred here. Assuming for the sake of argument that the probable cause requirement occurs at the time of filing and not at seizure, where does that leave you in this case? Well, in this particular case it really doesn't make any difference because none of the after-acquired information, post-seizure information, was included in the complaint. So whatever they were learning about activities in Florida did not surface at the time of the forfeiture complaint. That information may have been known to the government but certainly wasn't known to me or in the public pleadings, did not appear until deep into the summary judgment process. So in this particular case there would be no difference, except that I would be ---- You say it didn't appear. Didn't the government have a file in Florida that was open and active before this stop was ever made? Yes. So it's the same government, isn't it? It's not a different government. No, it's the same government, but ---- So the United States is trying to forfeit the money and the United States knows all these facts from its prior put-together, right, investigation? They know about Miguel's complaint. The government knows, not they, the government. Right. But I think the question was if that information, post-seizure information, is not contained in the complaint, does that change anything? And I think to answer the question is the after-acquired information changes in CAFRA of 2002 would allow the government, I mean, that's the very purpose of it, to go back and cure a defective complaint. So the question here, can they go all the way back and cure a defective seizure, if you will? And in my mind they can't do it under the statutes, and more importantly, even if you think that they can, even if the reach of the after-acquired information goes all the way back to the side of the road in northern Arizona, even if they do that, then you shift to a taint analysis, which in my mind, traditional Fourth Amendment taint analysis, which in my mind prohibits the use of the after-acquired and post-seizure information to base forfeiture on. Let me ask you another question and shift a little bit. Does it make any difference that the caption in this case involves two entities, one, the truck, and secondly, the contents of the truck, the cash of $400,000 plus? I don't think so. Is there a different analysis, I guess, on the currency versus the truck in terms of the Fourth Amendment analysis in your view? No, I would think not, because whatever criminality, if you will, that relates to the truck is a function of it being the vehicle used to carry the money. You can see that the money was in part welded into the frame of the truck and wasn't obvious on a look-see at the time of arrest, right? It was some sort of hidden compartment. I don't know what exactly it was. In Admiralty, they start talking about the ship, its anchors, oars, rowboats and sails and all this stuff and machinery and so on. And this could have been pleaded the same way, the truck and all its contents in the gas tank and transmission or wherever else the money was secreted. But they didn't plead it that way. They pleaded as two defendants. Right. But again, the criminality, if you will, didn't – the suspicion of criminality didn't occur until the discovery of the money because the truck wasn't doing anything visibly illegal until the money was discovered inside of it. Well, not so, but I think if you start with a different analysis and say that all of the florid information comes in, it seems to me that that would implicate the truck but maybe not necessarily the currency because the currency was discovered – was illegally seized. Well, it could, yeah. I suppose if you allow it, I'll – I think I've already lost that point, though, because the magistrate or the district judge in this case found that the florid information was sufficient to justify forfeiture of both defendants. Yes. But, you know, this is an appeal of that decision, too. Correct. Well, in the heart of the appeal, again, it's the after-acquired information. And even if I lose that point, if this panel disagrees with me on that point, then it becomes a traditional Fourth Amendment taint. And the query that I would – or the focus of that query, in my mind, ought to be is what the government did as a result of this illegal discovery of this money. And I think that there's some case law in the brief about a line of cases that deal with attenuation and taint along the lines of did that illegality significantly direct their subsequent actions. And the answer to that has to be yes. There would have been no seizure, obviously. There would have been no initiation of a forfeiture action at all but for the discovery of this money. You concede the stop was okay, and you're only barring stuff that happens after the agent says you can head off on your way. But wait a minute. Come back. But anything prior to that, the Florida license plate, the identification of the vehicle, the vehicle itself and the passengers in the vehicle are all known to the government, right? Well, at least up through the drive. And there's no Fourth Amendment problem with any of that? No. Okay. Okay. But, for example, if you start with the analysis that the currency was illegally seized, not the truck but the currency, and so that part of it can't be taken into consideration in determining probable cause, then it seems to me there's probably a different analysis on the currency as opposed to the truck. Well, I guess it depends on when the truck was seized. You know, it was legally seized, if you will. The first 10 minutes of this traffic stop was legal. It's after 10 minutes or so that it becomes illegal. But the seizure, I think, that's more imperative in this particular case is when the government actually seized it for forfeiture rather than just seized it to search it there at the scene. And that, of course, did not occur until after they discovered the money and they just take everything and leave the scene. But it still seems to me that but for this, whether you call it it significantly directed the investigation or I think the United States v. Murray, the Supreme Court called it, did it prompt the agents to take the next step. But for the illegality, there would have been no forfeiture action because forfeiture is a little bit different. It's an action against specific property. What illegality controlled the agents who call Florida because they know about legally know about a Florida license plate? If their inquiry was the result of information gained in that first 10 minutes of the stop, there's nothing to prohibit you. All right. And you can see they knew that there was a Florida truck involved and they called Florida, right? But they were not in. They didn't call Maine or Vermont or Washington State. Correct. They called Florida because it had a Florida plate on the truck. But they were involved only because of the illegal seizure and arrest of the occupants of this truck. This was not the Arizona agent on the phone doing a record or on the radio doing a record check of these guys. This was not something he did when he got back to the office. This was something as a result of taking this truck, this money, and these people off to jail. All right. Now, where do I find those facts in the record? Do you want to give me chapter and verse? Because the defendants didn't testify. No, they did not testify. In the judge's order, I'm not exactly sure what facts the court is inquiring about. Well, you're asserting that all of the information received from Florida is tainted. Correct. And I'm asking you whether all of that information from Florida is not tainted because all they had to do was they did a plate check. That information alone supported a call to Florida. And, man, the information flowed right and left about these two guys and what they're up to. Well, they didn't know anything about Mr. Bruno. And you say it's all tainted. And I'm trying to find in the record where anybody testified to facts supporting a taint. The affidavit of Agent Jacobson explains what he did in relation. . . He's a DEA agent that was contacted after the seizure of the money. His affidavit basically says, I got this information because of the money. You know, I called back to Florida to see if they had any. . . I don't know whether they called. Actually, I think they just entered an anatus, and then they get a contact, and then they call. But that part's not in the record. But it was Agent Jacobson, post-arrest, that did these things. Getting back to the issue of taint, though, and this is one complaint I had with the ruling of the district court, it's the government's burden to show a lack of taint. You have an initial illegality. We're complaining that you can't use any information for the two reasons we've been discussing, and it's the government's burden to show a lack of taint. The magistrate, the district judge in this court, did not make any holding that they brought in this stuff because of the way that it was acquired or whatever, that it was untainted. So I think if for no other reason, forget the substance, but just the fact that the magistrate judge just took the government at the word that this was untainted without any information I think what you're looking for,  Well, it doesn't. Where in the record does it show that it's untainted? It doesn't show that either. But we do have a sequence of events. Well, don't argue that it's tainted, then, if there's nothing in the record to support it. It's a neutral factor, isn't it, or an unresolved factor. You can't rely on it, and neither can the government, if there's nothing in the record. But it's their burden. It's the government's burden to show that this information is untainted, and that did not occur on this record. All the government shows is they picked up the phone, used the license plate to talk to the DEA in Florida, and, man, the information started pouring over the line. But, again, I don't think that that's supporting the record. I don't think it was the license plate that led them there. It was the arrest of Miguel Camacho that led them there. Why did they check Florida? I mean, why didn't they call those offices? My belief, and this may be in a Jacobson affidavit, my belief is they just hit the Natus database, there's a hit, then there's a contact officer. In this case, it would have been the guy in Florida. Do you want to save some time for rebuttal? You have about two minutes left. Okay. I'll reserve anything left. Thank you. Thank you. You're from the government? Good morning. Joan Wufanok, appearing on behalf of the United States District of Arizona. You'll have to speak up a little bit. Oh, I'll try my best. You can move the microphone a little closer to you, which will help us. There you go. Okay. Is this good? Yeah, it's fine. Okay. With regard to the court's question about what the government knew, when the truck was stopped, you had the fact that they were out-of-state plates, that the person was driving in what was believed to be potentially unsafe manner because he crossed over the line. When the vehicle was stopped, which as the court has already recognized was a lawful stop, the officer went to the truck and noticed a strong odor of air fresheners, which, from his experience, he knew was often used by drug traffickers to mask the odor of controlled substances. So there was more than just a stop that led the DEA to make a phone call. The air freshener alone doesn't give him probable cause. It's not a prohibited. No, absolutely not probable cause. I hope not. A lot of people have those little trees hanging from their mirror in a car and they're perfectly legitimate. A lot of taxis do it. Absolutely. But it didn't, and the government's not saying it gave probable cause, but, again, it was reason why DEA would contact Florida, would use the information that the court's already recognized, the license plate, the other information to contact Florida, because suspicions were raised. And in this case, we are controlled by CAFRA because of the date of the seizure. There has to be probable cause for the initial seizure. District court found there was not probable cause down the line. But CAFRA also tells us that the complaint can't be dismissed for lack of probable cause or for lack of meeting its burden at the time of the seizure that we're entitled to use after acquired evidence. As the court appears to have recognized, there was an ongoing wiretap as of May 9, 2003, over a month or basically a month before the seizure. So the government was aware of Mr. Camacho. The government was aware of the truck that was involved in this seizure. If we concluded that CAFRA didn't change the probable cause requirement, where would that leave you? The complaint, the government agrees that the complaint itself, because some of that evidence was subsequently suppressed, does not state probable cause. But the government had probable cause at that time. It was an ongoing investigation. And as the court knows, wiretaps are not public record until they're ordered unsealed by the court. And I don't believe they were. So you didn't have probable cause at the time the complaint was filed. You contend you did subsequently have probable cause. Does the admission by the district court of the illegally seized currency as evidence affect that analysis at all? And what disturbs me a bit is that it seems illogical to me that you could consider illegally seized evidence under a Fourth Amendment analysis and use that to demonstrate probable cause. Well, I have two answers to that. The first being in 191,000, which is cited in the government's brief and in Clayman's brief, this court cited with approval the D.C. Circuit case of U.S. v. 639,000. And I'll leave off the Ns just because it gets confusing.  When illegally seized property is itself the defendant in a forfeiture proceeding, it may not be relied upon to sustain a forfeiture, government agrees. But it is not excluded from the proceeding entirely. Such property may be offered into evidence for the limited purpose of establishing its existence and the court's in rem jurisdiction over it. And I would submit to the court that that is exactly what the district court did in this case. She did not allow any of the evidence with regard to where the money was found, how it was packaged, hidden, anything else like that, simply the mere fact of it is $493,000 X dollars and that the court had jurisdiction over it. It was additional evidence from Florida that established that Mr. Camacho had made statements that he had a number of rigged trucks that he transported to use to transport drugs and money between Mexico and Florida. I read her opinion a little bit differently. Okay. But are you, is that your interpretation of what she was doing, that it was just to establish jurisdiction? And the existence of it? Right. That she doesn't have to accept it to be. I understand your argument. But you think she was doing something different than using it as part of a determination of probable cause. Correct. Yeah. I don't believe that she was doing that. I think that she was just accepting it. And because, frankly, she didn't have to because of the other or wait a minute, let me back up. I don't want to, I think I'm confusing myself and the court with that. She recognized that that was the caption of the case. And the government believes that $191,000 lets her do that. But I don't know that she used it to determine probable cause because I don't believe, well, the government's position is probable cause wasn't needed. All right. Well, if she did, that would be error. You would agree with that? Under the D.C. Circuit case? It would appear to be. Okay. Go ahead. I derailed you with my question. Well, I'm so the government's investigation in Florida was clearly ongoing at the time the stop was made. That evidence was known to the Arizona agents, but not actually produced to the court until November of 2004. But the government submits that because it was an independent basis, it was clearly an independent basis, but even if you were to find that it wasn't an independent investigation, it was clearly attenuated because although claimants continue to use a but-for test, this court specifically rejected in United States v. Smith, cited in the government's brief, the but-for test. It did it significantly direct any kind of Miami investigation, and we submit that it clearly did not because the wiretap was up and running, because Mr. Camacho was already identified as a suspect in May of 2003 prior to the stop of the truck, and because the truck itself was already connected to that investigation because it had been used to transport a known drug trafficker from the house of another known trafficker to Mr. Camacho's house where that known drug trafficker spent five days. And all of this occurred prior to the seizure in this case, or the unlawful seizure of the currency. So the government submits that that independent investigation is what led to additional information with regard to Mr. Camacho, that he was involved in drug trafficking, that he did have trucks specially equipped to transport drugs and money, that he did admit to another of the drug traffickers that he personally transported money from Florida to Mexico in order to pay off his transportation system, and that his organization was making at a minimum a million dollars a month. So it certainly wasn't out of the realm of possibility that he would be transporting the $493,000 involved in this case. And I'd submit to the court that when you couple that with we've got a truck that's stopped on an Arizona highway heading south towards Mexico, not north. It's not on the most direct route from Miami over to Arizona. But that truck has the air fresheners, and that's known to be potentially used as a mask for controlled substances, that all of that evidence supports the preponderance of the evidence standard of the money found in that truck was related to drug trafficking. Any further questions? I think we have your argument in hand. I have one question. Does it make any difference that you segregate the cash from the truck in your caption? As I understand it, we're operating under admiralty rules, where you see when they libel a ship, they'll libel the ship by name, and then its anchor, its machinery, its oars, its everything else. They'll list it all out as one respondent. Here, you have split the truck from the cash in essentially making a claim against two different entities. Right. And if you'll give me one minute, I believe... I didn't do the pleading, so I'm just going from what I can figure out from the record. And my answer would be I thought initially that perhaps it's because it was charged under a different section of 881. In other words, the currency and the truck, there would be different levels of proof, because one has to be, is it tied, I guess are they both tied to drug trafficking, but in the event that the court were to find that one was and one wasn't. I really can't explain why it was done separately. Secondly, you have entered into agreements for the sale of the truck, so the truck is gone and cash is substituted for the truck? No. Is the truck still at issue here or is that question moot because of agreement between the parties? It's the government's position. The claimant and the government. It's the government's position that the truck is no longer before the court because it was the claimant's responsibility or obligation to file the appeal bond. Yeah. They did not do that. Therefore, the truck was sold. All right. So the truck question is moot? Is moot. So it's just a question of the cash before this court, which... Do both of you agree that it's moot? I can't speak for a claimant. Okay. Do you have an agreement that says it's moot? No, but I do have the case that the government cited in its brief, if you'd like me to give you the name. Okay. In the jurisdictional statement, it was the government's position that the truck is no longer before the court. It's simply the cash, the currency. So the cash is substituted for the truck? No, it was proceeded against independently. Let's assume we reverse on the truck. Just assume that. Does the cash go back to Camacho? No. For the truck that you sold it for? The government has the money, doesn't it? I imagine the government. It went into the government's coffers, yes. Okay. So would you return that to the defendants if we reversed? If you order that it was improperly forfeited, then I think we would have to. Okay. What's your best, leaving aside the truck for the moment, what's your best evidence that the currency was involved in drug trafficking? The fact that based on the Miami investigation, Mr. Camacho was heavily involved with the Hernandez and the Martinez organizations, that he had discussions with both of those organizations with regard to do drug deals with them, that he told Mr. Hernandez that he was, his drug organization was doing very well, and I previously stated with regard to the trucks and that kind of thing. Let's assume, for example, that it was platinum that they found. Well, I ---- Or gold. What would indicate that in this record, aside from the drug trafficking, because that's what you're describing, that the currency was involved? I think that the court has to consider that it's currency. So the court has to, and I say that because the court's correct, perhaps if it were some other type of item, it wouldn't be tied to drug currency, or I'm sorry, to drug trafficking. But in this case, cash was specifically tied to drug trafficking because ---- There is no testimony from the claimants at all with respect to the source of the cash, is there? That's correct. They submitted no statement of facts whatsoever, and they did not dispute the government's statement of facts. And the government's statement of facts discusses in detail, and that would be on the affidavits that are submitted in the supplemental excerpts of record, that Mr. Camacho explained in detail to Mr. Hernandez how much he charged for the drugs that he purchased from Colombia sent through Mexico. He sold those drugs for one price in Miami and for a higher price up in New York. And it was, as I said, when you go through the math on that, it was anywhere from $1.4 to I think $3.4 million a month that was being produced through this drug organization. So because it was cash found and because the further testimony or the further affidavit says that these trucks were used, specially equipped trucks were used to transport the money from Miami to Mexico to pay the Mexican organization so they would continue to be a pipeline from Colombia, that any cash or an excessive amount of cash found in that truck, certainly if it was $0.25, it wouldn't be, we couldn't say that was tied to, but when you've got $400,000 in cash on its way from Miami in the direction of Mexico, in light of the other circumstances, that's substantial evidence that that cash is tied to drug trafficking. I gather your position would be it wouldn't matter where the cash was found, in a hotel room or any other place, right? That's correct. Because you probably could have pled this or the government could have pled this, as Judge Beezer said, the truck and its contents, but it chose to proceed separately. So it seems to me we probably have to analyze the forfeited items separately. In other words, you can't just say the cash is found in the truck and we can take the truck, therefore we can take the cash. You have to analyze on whether there's proof. And you've stated your argument on that, but I just thought I'd, so you could see where, what my analysis might be on this case. I would urge the Court, though, to read the case, and if I can just state it for the record with regard to jurisdiction at this point over the truck, and that is United States versus $2,490 in U.S. currency found at 825 Fed 2nd, 1419, and Ninth Circuit, 1987, which is, court's jurisdiction to hear appeal terminates when forfeiture judgment is properly executed. And it's been executed on the truck because there was no bond. That's not cited in your brief, or is? It is, Your Honor, and that's found in the statement of jurisdiction. That's fine. How do you deal with Hayes, then? I'm sorry? Hayes, I believe it is. I didn't understand you. My ears are plugged. Wait. Hayes is the name of the party? Oh, no. $2,490. It's at page 1 of the government's brief, over onto page 2. Oh, I'm sorry. Ventura Pack. This is what I was thinking about. Are you familiar with Ventura Packers? I think there are no more questions. If you want to sum up, or I think we have your argument in hand. If the Court's comfortable, I mean, I believe that under CAFRA, there's no requirement of probable cause, that CAFRA basically abrogated that requirement of $191,000. And that the after-acquired property here, because as the Court stated in Los Francisco's way, and again I'm abbreviating all these cases, but as the Court stated there, the government doesn't have to prove its case to get in the courthouse door. We don't have to have established our preponderance of the evidence or even probable cause in the complaint to proceed against the property. Okay. Thank you. Thank you. Rebuttal. Well, I guess the point that I think that I wanted to try to make was if probable cause is required for seizure for forfeiture at the time of the seizure and that doesn't exist, then what's the remedy? In some of the legislative history, Representative High said in those circumstances, something like this, then I would be entitled to a motion for summary judgment because the government hasn't we're not talking about at the pleading stage. We're talking about at the stage where they actually take this property. If there's no probable cause at that point, there ought to be a remedy. And I think the remedy is under the statute. And then, of course, if the Court disagrees, then we shift to a taint analysis. But there ought to be something to prevent the government from illegally taking property and then using its investigation as well as the court discovery process itself to gather the information it needs to meet its ultimate burden. Certainly, CAFR recognized because they increased the ultimate burden to a preponderance that it was reasonable and obviously under the legislative intent to let them go back, to not bar the government from using the discovery process to cure the ultimate deficiency, if you will, at the filing stage. But it's silent for good reason because it doesn't make any sense as to go all the way back to the seizure for forfeiture stage. And there ought to be some way that the government ought not to be able to just take stuff and then later on justify or try to find some justification for retaining it. I think that's what this case is all about, and I think that that's really the ultimate issue. Where's the remedy for an illegal seizure when there's no probable cause not just to search, which was the magistrate's determination, but to seize for forfeiture? That's the issue that I think is key here. Thank you. Did you read the magistrate judge's order the same way the government does, in that she was just entering evidence of the currency for the fact that it existed and for the exercise of on-rem jurisdiction? No, I did not read it. I thought that she used the quantity of money. She actually made reference to the caption itself, and in rejecting my widget argument, if you will, that this is a featureless item, that nothing about its characteristics can be used for any reason, she basically said, of course, the government could never prove that. I don't think she used the word widget. I couldn't find the quote. The government could never prove a drug connection to a featureless item, something along those lines. So I think the court's reading is correct, is that, to a limited degree, she used some of the nature of the seized currency in her determination that there was probable cause. Okay.
judges: Farris, Beezer, Thomas